FILED IN CHAMBERS
U.S.D.C. - Atlanta

AUG 25 2017

James N. Hatten, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BIANCA R. PAPAPIETRO,

    Plaintiff

v.

SMURTI CORPORATION, MANOJ G. BAROT, and RAHUL PATEL,

    Defendants

CIVIL ACTION NO.
1:15-CV-652-ODE

ORDER

    This case under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, is before the Court on Plaintiff's Motion for an Award of Liquidated Damages [Doc. 74] and Plaintiff's Motion for Attorneys' Fees and Costs [Doc. 78]. For the reasons stated below, both motions are GRANTED IN PART and DENIED IN PART.

I. **Procedural Background**

    On January 30, 2017 a jury found Defendants Smurti Corporation ("Smurti"), Manoj G. Barot, and Rahul Patel liable to Plaintiff Bianca Papapietro for violations of the FLSA [Doc. 75]. The jury awarded Papapietro $349.24 in overtime pay, $312.00 in damages for Smurti's suspending Papapietro in retaliation for her insistence on timely overtime pay, and $3,781.24 in damages for Smurti's discharging her in retaliation for her insistence on timely overtime pay [Id.].

    On February 1, 2017 Papapietro filed a Motion for an Award of Liquidated Damages [Doc. 74]. Defendants filed a Response [Doc. 84]. Papapietro filed a Reply [Doc. 88].

On February 13, 2017 Papapietro filed a Motion for Attorneys' Fees and Costs [Doc. 78]. Following a Response [Doc. 86] and a Reply [Doc. 89], these two Motions are before the Court for ruling.

## II. Trial Evidence

The trial evidence showed that Papapietro, an administrative assistant, began work at Defendant Smurti on Thursday, November 13, 2014. Her last day of employment was Friday, January 30, 2015. When Plaintiff was hired she and Defendant Barot, Smurti's owner and Chief Executive Officer, agreed she would be paid $13.00 an hour; she would generally work from 8:30 a.m. to 5:30 or 6:00 p.m. with a one hour break. It was understood that some days would be so busy that a break or full break would not be possible. Therefore, from the beginning the parties contemplated the possibility of overtime work. Plaintiff testified that no one told her initially that it was necessary to have overtime approved in advance. Barot testified he told Papapietro that on November 13, 2014. For purposes of this Order, the Court accepts Plaintiff's version.

The particular Smurti location at which Papapietro worked was Smurti's "administration" office where Smurti's executives Barot and Patel worked; three to five others worked there as well. Papapietro worked for Defendants Manoj Barot and Rahul Patel, Smurti's District Manager. At this location Smurti used timesheets for employees entitled "Scheduled Time versus Actual Time Worksheet." For each day of the week, the sheet showed the scheduled hours for the employee. There was also a space for the employee to enter his or her actual hours worked for each day. Employees were expected to fill in their actual work hours each day.

Papapietro kept handwritten records of her daily work hours, including breaks. Her first recorded overtime was during the week ending November 23, 2014 when she accrued and entered three hours of overtime.

Most of Papapietro's overtime work was done at the office but some was done at home. On January 14, 2015 Papapietro began work at the office at 5:50 a.m.--presumably when no one else was there. On that day she claimed a total of 11.4 work hours (12.4 work hours less one hour break time), causing the total work hours for that week to considerably exceed 40. None of Papapietro's overtime work was authorized in advance by management.

Defendants stipulated that Papapietro was not exempt from the overtime requirements of the FLSA.

Smurti pays employees on a biweekly (every two weeks) basis. Papapietro's regular pay checks (or deposits to her account) included regular time payments (up to 40 hours a week), but not overtime payments.[1] Overtime checks were issued separately; one check for $324.63 on December 24, 2014, one for $49.19 on December 31, 2014 and one for $136.50 on or about February 2, 2015. The December 24 check was issued after Plaintiff asked the payroll clerk about the status of her overtime pay. The payroll clerk advised her to speak with Barot. Plaintiff spoke with Barot and Patel regarding her overtime pay on December 15; the payment was authorized. The December 31 check was issued after Plaintiff and Smurti's payroll clerk

---

[1] On some occasions the "regular time" payments included a "straight time" payment for hours over 40, i.e., a partial payment of overtime. There is no explanation for why this happened; it appears to have been an idiosyncratic decision by Smurti's payroll clerk.

calculated that the December 24 check was deficient; Plaintiff had been underpaid by $49.19. Defendants contend the timing of the overtime payments was due to the payroll clerk's need to obtain management approval of the overtime hours before preparing a check, and also due to the payroll clerk's difficulty in understanding Plaintiff's time entries. All of the overtime requests were approved. Plaintiff contended at trial that Defendants miscalculated her overtime payments because her time records understated her work time; when Papapietro wrote "break" on her timesheet she did not necessarily mean that she had taken a full one hour break. At trial Papapietro identified occasions when she had taken less than an hour break, thus augmenting compensable hours for the day, and potentially adding compensable overtime for the week.

Defendants contended at trial that when all payments to Papapietro were added up and the amounts due were subtracted, Papapietro was overpaid, not underpaid. This was a close question based on the trial evidence. In Plaintiff's counsel's closing argument he argued that Plaintiff should be awarded $187.04 for unpaid overtime and $3,120 in retaliation damages.

In response to Papapietro's claims for retaliation damages, Defendants asserted that they had been dissatisfied with Plaintiff's services prior to January 30 for numerous reasons. They pointed in particular to an email dated January 12 in which Defendant Barot told Papapietro:

> I find that you become defensive in your responses and explanation to me while I am trying to get accountability and making sure that tasks are completed correctly.
> It is my job that I make sure that tasks given are completed correctly and are in compliance with contractual obligation that I have.

4

> You are my assistant and I am trying to communicate and get all the tasks coordinated through you!!!  I also need an assistant with whom I can communicate well and freely for all BUSINESS related tasks.
> 1) I had personally showed you all the chemicals at the One Stop locations and I had requested that I need the MSDS for those chemicals.
> I think I was very clear about what exactly was needed.  What was presented to me doesn't match with what has been ordered and has quite a few doubts about the MSDS binder prepared.
> 2) I had also explained you about the LEAF car key, accountability and accessibility and you know over the weekend I was struggling for that.
> 3) Also the marketing items for One Stop (Menus, website, order forms) are delayed and there seems to be wrong information about measurements and more.  And most importantly the DEADLINES.
> 4) Leaf car decals have not been produced by sign company as per the order and instructions[.]
> This email is because of the few things which happened in last week.
> I suddenly feel that I have to recheck all the work which have been co-ordianted [sic] by you!!  That is definitely not a good situation for both of us and of course for the business as well.
> Please take time to understand and get correct clarification for the tasks to be coordinated and as I always say please ask for DEADLINES and make sure assigned work tasks are completed as per the deadline.
> It is very important that I feel CONFIDENT about your tasks coordination and that I don't feel restricted when I want clarification about the tasks completion

[Doc. 77-31].

On or about January 26, 2015 Papapietro spoke with Smurti's payroll clerk about her overtime pay that was due.  The payroll clerk advised her to send a note requesting her overtime, and make it sympathetic.  On January 28, 2015, Papapietro sent an email to the payroll clerk, who then forwarded it to Barot.  In the email, Papapietro noted that 7.9 hours of overtime she had worked were not accounted for in her paycheck.  She then noted "[a]s a mom, I am constantly in need for something.  I sacrificed my family time to help OneStop transition effectively so please clarify this inaccuracy" [Doc. 77-45 at 2].

5

Just after noon on Friday, January 30, Papapietro sent Patel and Barot an email to let them know that she would be leaving at 12:15 p.m. so as not to work overtime hours that week. Patel orally approved Papapietro leaving early, and asked her to come talk with him after she signed out for the day and recorded her hours, and before she left. At the meeting, Patel told her that there was some confusion over her job description, and until her job duties were clear, she needed to turn in her office keys, and company cell phone and iPad.[2] He told her that they would come in again on Monday, and create a job description.

On Monday, February 2, Papapietro went in to Smurti, and met with Patel and Barot. Papapietro covertly recorded the meeting. Patel and Barot first asked her to return the company cell phone, and then indicated several issues they had with Papapietro's job performance. Papapietro was given the third of her overtime checks, and was told to compile a job description for her job, and submit it by Wednesday. Evidently she was told not to report in on Tuesday or Wednesday. This is the apparent basis for Papapietro's claim that she was suspended.

Late on the afternoon of Tuesday, February 3, Papapietro emailed Patel a job description for her position at Smurti, and asked when she should come in to discuss it. Patel responded via email shortly thereafter indicating that he would review the job description, and asking if Papapietro could meet Wednesday after 2:00 p.m. That evening and the following morning, Papapietro emailed Patel asking

---

[2] Ultimately, Patel allowed Papapietro to keep the cell phone a bit longer, so that she could remove her personal information from the phone.

for a specific meeting time. On Wednesday morning, Patel emailed Papapietro to set a meeting for Thursday, February 5, at 10:00 a.m.

Papapietro met with Patel on Thursday, February 5, 2015. She and Patel discussed tasks that he felt she had not completed properly. He then indicated that if she wished to continue working at Smurti, she would have to send an apology letter for her prior performance failures by 5:00 p.m. that day. Smurti would then transfer her to a part-time position working in a different department. Her status was left inconclusive at the end of the meeting. Before 5:00 p.m. that day, Papapietro emailed Patel stating "I decided I will not write the apology letter because I do not agree I did something wrong" [Doc. 77-10 at 1]. She did not return to Smurti. Papapietro signed a retainer agreement with current legal counsel on February 9, 2015 [Doc. 91-1].[3] This lawsuit was filed on March 4, 2015 [Doc. 1]. Papapietro found a new job mid-March 2015.

Papapietro essentially testified that Smurti's overtime payments were grudging; she asserted that her insistence on timely overtime pay was what caused Smurti to offer her less than full time employment, justifying her decision to quit, i.e., her constructive termination. The jury answered questions on a special verdict form, and determined that Smurti retaliated against Papapietro for complaining about its failure to properly pay overtime, and by offering her a lesser job. The jury's retaliation award consisted of

---

[3]The agreement provides that if no attorneys' fees are awarded, Plaintiff would have no obligation to pay attorneys' fees [Doc. 91-1 at 1]. The Court reads the agreement to say that in the event of a recovery, in addition to any amount awarded as attorneys' fees, Plaintiff would owe her counsel 33% of her retaliation damages award, but not any part of her overtime or liquidated damages awards [see id.].

7

damages for Papapietro's three day suspension from Smurti, and damages for the six weeks when she was looking for a new job.

## III. Discussion

### A. Motion for an Award of Liquidated Damages

In her Motion for an Award of Liquidated Damages, Papapietro seeks $4,442.48 in liquidated damages. This includes an amount equal to the jury award for overtime pay ($349.24) plus an amount equal to retaliation damages ($312.00 for suspension damages and $3781.24 for constructive discharge damages) [Doc. 74]. Papapietro argues that Defendants did not affirmatively plead that they acted in good faith as required by the Portal to Portal Act, 29 U.S.C. § 259 such that Defendants are now barred from opposing her claim for liquidated damages. She cites Cole v. Farm Fresh Poultry, Inc., 824 F.2d 923, 926 (11th Cir. 1987) and notes that Cole requires the defendant employer to show that its action was taken "in reliance on a written administrative interpretation by a designated agency" [Doc. 74 at 2 (quoting Cole, 824 F.2d at 926)].

Defendants' response cites a different provision of the Portal to Portal Act, 29 U.S.C. § 260, which states in pertinent part:

> if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

This section, not § 259, applies here. Section 259 establishes a defense to liability, not a defense to an award of liquidated

8

damages. Now that the liability phase has been resolved, Plaintiff's reliance on § 259 and cases cited under § 259 is simply not apt.[4]

There is no Eleventh Circuit case which holds that § 260 requires the employer to specifically <u>plead</u> good faith--in addition to proving good faith--in order to avoid imposition of liquidated damages. What is required is that defendant <u>prove</u> that it acted in good faith.

The Court does recognize that in an FLSA overtime case, defendant's claim of good faith must be brought to the attention of plaintiff in time for plaintiff to contest it. While Defendants here did not formally <u>plead</u> good faith in their answer, it became obvious early in the case that Defendants believed they had overpaid, not underpaid, Plaintiff. A letter from Defendants' counsel to Plaintiff's counsel dated April 20, 2015 asserted that Papapietro had been <u>overpaid</u> for overtime she worked [Doc. 78-1 at 24-25]. Plaintiff was well aware that this was Defendants' contention; therefore, she was not prejudiced by the lack of formal notice.

Defendants argue they acted in good faith in paying overtime to Papapietro as required by § 260. Defendants claim this is so because they reasonably believed they had paid Plaintiff all overtime pay to the best of their knowledge.

---

[4]The Court notes that Plaintiff does cite cases interpreting § 260 in her Motion for an Award of Liquidated Damages [<u>see, e.g.</u>, Doc. 74 at 3 (citing <u>Barcellona v. Tiffany English Pub, Inc.</u>, 597 F.2d 464 (5th Cir. 1979)]. However, to the extent Plaintiff seeks to rely on § 259's good faith defense, that reliance is misplaced.

1. <u>**Liquidated Damages in Connection with a Successful FLSA Overtime Claim**</u>

Under the FLSA, an employer who fails to pay overtime is liable to his employee for the unpaid overtime, and for an additional equal amount in liquidated damages. 29 U.S.C. § 216(b). The Court need not award liquidated damages if the employer shows that it acted in good faith, and with a reasonable belief that it was in compliance with the FLSA. 29 U.S.C. § 260.

While it is a close question, the Court is persuaded that Defendants paid Papapietro all of the overtime pay they reasonably believed she was owed before this lawsuit was filed. Papapietro made her own time entries and told Defendants what overtime hours she had worked. They paid her for that overtime. This establishes Defendants' good faith claim to the extent it is based on failure to pay the proper amount of overtime.

However, Papapietro also claims that overtime payments were made late under the FLSA, specifically under 29 C.F.R. § 778.106 which provides, in part:

> There is no requirement in the Act that overtime compensation be paid weekly. The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

The Court concludes Defendants are obligated to pay liquidated damages for failing to make timely overtime payments as defined by the foregoing regulation. This stems from their failure to persuade

10

the Court that they acted in good faith in the timing of specific overtime payments to Plaintiff. Defendants do not explain why they thought specific overtime payments were timely under the FLSA; they simply assert that in general their actions were reasonable because it was difficult to interpret Plaintiff's time sheets. This is insufficient.

Upon consideration, the Court awards Plaintiff $200.00 in liquidated damages in connection with her late overtime payment claim. The Court believes this award fairly addresses Plaintiff's inconvenience in receiving late overtime payments.

Plaintiff's Motion for an Award of Liquidated Damages (in connection with her overtime claim) [Doc. 74] is GRANTED in the amount of $200.00.

### 2. Liquidated Damages in Connection with a Successful FLSA Retaliation Claim

The United States Court of Appeals for the Eleventh Circuit has set a separate standard for making awards of liquidated damages in connection with successful FLSA retaliation claims. In Moore v. Appliance Direct, Inc., 708 F.3d 1233, 1242-43 (11th Cir. 2013) the Court of Appeals held:

> [W]e join the Sixth and Eight Circuits in holding that the second sentence in section 216(b), which allows such damages "as may be appropriate to effectuate the purposes of [the retaliation provision]," creates a separate, discretionary, standard of damages for retaliation claims. We therefore hold that the retaliation provision of 29 U.S.C. § 216(b) gives the district court discretion to award, or not to award, liquidated damages, after determining whether doing so would be appropriate under the facts of the case.

The Court further held that:

> it is just as clear that the extent of that separate relief [for retaliation] is discretionary, requiring a finding that any such relief . . . is appropriate to effectuate the

11

> purposes of the retaliation section of the law. There is no more basis . . . for holding that liquidated damages are required to be awarded in a retaliation case, than there would be for requiring reinstatement, or promotion, or front pay. Whatever is awarded must be appropriate to effectuate the purposes of the retaliation provision, and determining that requires the exercise of wide discretion.

Id. at 1241.

The jury's award in this case gave Papapietro full compensation for her suspension from Smurti and for the period of time after her constructive discharge when she was looking for new employment. Further, according to a statement made by the defense during a hearing on April 18, 2017, Defendants paid the jury award in full immediately following trial. Plaintiff did not counter this assertion, so the Court accepts it. Also, Defendants' evidence on the retaliation claim was not without substance, even though Defendants did not prevail on this claim. An award of liquidated damages on the retaliation claim is not necessary to adequately compensate Papapietro, nor to deter Defendants from similar conduct in the future. Accordingly, Plaintiff's Motion for an Award of Liquidated Damages [Doc. 74] is DENIED as to the liquidated damages sought in connection with the retaliation claim.

### B. Motion for Attorneys' Fees and Costs

In her Motion for Attorneys' Fees and Costs, Papapietro seeks an award of $159,474.17 in attorneys' fees and $4,417.15 in costs [Doc. 78]. In response, Defendants argue that the fees requested are unreasonable because: 1) the number of hours billed was excessive, 2) the hourly rates were excessive, and 3) Plaintiff's counsel refused to negotiate attorneys' fees when the parties were attempting to settle [Doc. 86].

In reply, Papapietro asserts that Defendants did not contest her evidence as to reasonable hourly rates with admissible evidence; Defendants also did not make an offer of judgment under Fed. R. Civ. P. 68; Plaintiff did not refuse to negotiate Plaintiff's attorneys' fees [Doc. 89].

In an FLSA action, "the court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). In determining the appropriate amount of attorney's fees, district courts are to apply the lodestar analysis. Galdames v. N & D Inv. Corp., 432 F. App'x 801, 806 (11th Cir. 2011), Norman v. Hous. Auth. of the City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988), St. Claire v. Trauner, Cohen & Thomas, L.L.P., No. 1:07-CV-2082-ODE, 2008 WL 151542, at *1 (N.D. Ga. Jan. 11, 2008) (Evans, J.).

A lodestar analysis consists of four steps: (1) determine a reasonable hourly rate, (2) determine the hours reasonably expended, (3) multiply reasonable hours by reasonable rate, and (4) make any necessary adjustments. Norman, 836 F.2d at 1299-1302, St. Claire, 2008 WL 151542, at *1.

### 1. Reasonable Hourly Rate

The first lodestar step involves determining whether the requested fee represents a reasonable hourly rate. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman, 836 F.2d at 1299 (citing Blum v. Stenson, 465 U.S. 886, 895-96 n.11 (1984)). Work expended by paralegals, law clerks, and other paraprofessionals is

compensable to the extent these individuals are engaged in work traditionally performed by an attorney. Missouri v. Jenkins, 491 U.S. 274, 285 (1989). In deciding the reasonableness of attorneys' fees, the Court is an expert, and is entitled to rely on its own expertise. St. Claire, 2008 WL 151542, at *1 (citing Campbell v. Green, 112 F.2d 143, 144 (5th Cir. 1940)[5]).

Here, Plaintiff seeks an hourly rate of $400 for attorneys Charles R. Bridgers, Kevin Fitzpatrick, Jr., and Mitchell D. Benjamin, all of whom are partners in the firm [Doc. 78 at 18]. Plaintiff seeks $275 per hour for associate attorney Matthew W. Herrington, $145 per hour for paralegal Jessica Sorrenti and $105 per hour for paralegal Sarah N. Toenes [Id.]. Defendants argue that the attorneys' fees should be $300 per hour, and attorney Bridgers' fees should not be included at all as the case was overstaffed [Doc. 86 at 8-10]. Further, Defendants argue that the paralegals should be compensated at a maximum rate of $50 per hour [Id. at 10].

There is no one specific reasonable hourly rate for FLSA cases filed in this District. Rather, there is a range of such reasonable rates which takes into account the relative experience and expertise of counsel. Plaintiff's counsel's fees are within this range, at the high end. However, the fact that Plaintiff's counsel included three partners billing at $400 an hour in this simple case causes the Court to look more closely at the issue of reasonable hourly rate.

---

[5]Decisions of the former United States Court of Appeals for the Fifth Circuit issued prior to October 1, 1981 are binding precedent for the United States Court of Appeals for the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206 (11th Cir. 1981).

It appears that counsel Bridgers and Fitzpatrick performed different functions which mostly did not overlap. Mr. Fitzpatrick and Mr. Bridgers prepared the Complaint in January and February 2015 and Mr. Fitzgerald took over the primary management of the case from that point forward. In January 2017, about three weeks before the trial, Mr. Benjamin for the first time began working on the case in preparation for assisting Mr. Fitzpatrick at trial. Mr. Benjamin conducted an in depth review of the case file which was time consuming. He was present for all of the trial. He prepared and argued a motion *in limine* and also charge requests. He did not question any witnesses, argue any other motions, or make the opening statement or the closing argument. The Court identifies his main role as supporting Mr. Fitzgerald at the trial; he was available for conferences. Mr. Benjamin billed a total of 98.5 hours, of which approximately 52.92 hours was for file review and 45.58 hours was for attending and participating in the trial. Four hundred dollars an hour was an excessive hourly charge for these services. The Court is not questioning Mr. Benjamin's skill or experience (he does have considerable relevant experience, as set forth in his affidavit) [Doc. 78-2] but his contribution to this case does not merit a charge of $400 an hour. As a result, the Court finds that a rate of two hundred fifty dollars ($250) per hour is a reasonable charge for the services Mr. Benjamin rendered in this case.[6]

---

[6]The Court would consider reasonable an award of $300 per hour to Mr. Benjamin for his work on the motion *in limine* and charge requests, but Mr. Benjamin's hours are not presented with sufficient specificity to allow the Court to separate the hours spent on those activities from others which deserve reimbursement at a lower rate [see Doc. 78-1 at 12-16, 26-56, 61-95]. The Court also notes in

In addition, $400 an hour is an excessive rate for all of the partners because of this case's simplicity. Plaintiff's claim for unpaid overtime primarily called for use of basic, though tedious and messy arithmetic calculations. Very little legal analysis was required. Plaintiff's retaliation claim focused on events which occurred in a compressed time frame near the end of her employment-- from January 12, 2015 until February 5, 2015. The question was whether Plaintiff quit or was fired because she complained about tardy overtime payments. Plaintiff was only employed at Smurti for eleven weeks, and only received six regular paychecks plus the three overtime checks. Therefore, the Court will not award Mr. Fitzgerald or Mr. Bridgers fees of $400 per hour and finds that $300 per hour is a reasonable hourly rate for them in this particular case.

For the same reasons, the Court finds that Mr. Herrington's rate of $275 per hour is unreasonable, and reduces his rate to $225 per hour. The Court finds Ms. Sorrenti's rate of $145 per hour and Ms. Toenes' rate of $105 per hour reasonable.

### 2. Reasonable Hours Expended

The next step in the lodestar analysis is to determine whether the number of hours expended on the matter was reasonable. Norman, 836 F.2d at 1301. "'[E]xcessive, redundant, or otherwise unnecessary hours' should be excluded from the amount claimed." Id. (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)). If a Court finds the number of hours charged unreasonable, it may either analyze the

---

deciding this rate that Mr. Benjamin has sought compensation for time spent "traveling" to the trial [see, e.g., Doc. 78-1 at 54], which is not reimbursable. As a result, the Court awards Mr. Benjamin an across the board rate of $250 per hour for all his work on this case.

charges hour by hour, or engage in an across-the-board cut to the hours requested. Bivins v. Wrap it Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008) (*per curiam*). "Any objection that time spent was excessive must be reasonably precise. General disagreements are not helpful." St. Claire, 2008 WL 151542, at *3 (citing Norman, 836 F.2d at 1301).

Defendants argue that the hours spent drafting the Complaint and in conducting post-Answer activities (depositions, responding to the Motion for Summary Judgment, trial preparation) was excessive [Doc. 86 at 6-8]. They also argue that Plaintiff refused to negotiate in good faith, in that her counsel refused to negotiate attorneys' fees [Id. at 11-12].

Plaintiff replies that her lawyers did not perform any duplicative work; they did not spend too much time preparing a detailed Complaint or in preparing for and taking or defending depositions (31.5 hours) [Doc. 89 at 5-6]. Plaintiff offered to settle for $3,640 in retaliation damages, $3,640 in liquidated damages, plus attorneys' fees of $9,700 on April 28, 2015 (before discovery commenced) but Defendants did not respond [Id. at 6-7 (citing Doc. 78-1 at 1-2, 5-6)]. Defendants could have made an offer of judgment under Rule 68, Federal Rules of Civil Procedure, which would have offered protection against rising attorneys' fees; Defendants failed to do so [Id. at 8-9].

The Court does not agree that Plaintiff's counsel spent too much time preparing the Complaint, which was helpfully fact specific. It asserted specific amounts of overtime worked by Plaintiff for five of the eleven weeks Plaintiff worked for Smurti Corporation [Doc. 1 at 11-19]. Defendants do not deny that they turned down Plaintiff's

17

offer early in the case [see Doc. 86]. It is correct that Defendants could have made an offer of judgment. Under the Federal Rules of Civil Procedure, if defendant makes a pretrial offer of judgment, and plaintiff rejects the offer, goes to trial, and prevails but ultimately obtains a judgment below defendant's offer, plaintiff must pay her own costs. Fed. R. Civ. P. 68. Rule 68 "costs" have been held to include attorney's fees when--as in the FLSA--the underlying statute defines attorney's fees as costs. Marek v. Chesny, 473 U.S. 1, 9 (1985). The Court also notes that the Second Affidavit of Kevin Fitzpatrick says, "I dispute [defense counsel's] representation that we communicated inflexibility on fees"; rather, he asserts that he merely pointed out to defense counsel that continued litigation would cause fees to escalate [Doc. 89-1 at 2].

Defendants' criticism of the amount of time Plaintiff's counsel spent on various aspects of the case is not "reasonably specific." Defendants merely assert that Plaintiff's counsel took too much time in conducting various activities. This does not give the Court adequate guidance to review these assertions.

### 3. Calculation of Loadstar

In sum, the Court calculates the lodestar as follows:

- Fitzpatrick: 241.62 billable hours x $300 (Court's reduced rate) = **$72,486**

- Benjamin: 98.5 billable hours x $250 (Court's reduced rate) = **$24,625**

- Bridgers: 17.56 billable hours x $300 (Court's reduced rate) = **$5,268**

- Herrington: 9.33 billable hours x $225 (Court's reduced rate) = **$2,099.25**

- <u>Sorrenti</u>: 55.75 billed hours x $145 = **$8,083.75**
- <u>Toenes</u>: 47.45 billed hours x $105 = **$4,982.25**
- **TOTAL: $117,544.25**

### 4. Adjustments to Lodestar

The lodestar calculated through the foregoing analysis is strongly presumed to be reasonable. <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. 542, 554 (2010). However, in some circumstances, such as where the hourly rate is an inadequate measure of market value, the attorney's work involved extraordinary time and expenses, or there is an exceptional delay in the attorney receiving compensation, the lodestar calculated should be adjusted. <u>Id.</u> at 554-56. The proportionality between a plaintiff's recovery and the amount of fees her attorney recovers is relevant to the amount of fees to be awarded, but not determinative. <u>City of Riverside v. Rivera</u>, 477 U.S. 561, 574 (1986). The lodestar is thus to be adjusted only in exceptional circumstances.

Here, the Court notes that Plaintiff's counsel assumed the risk that Plaintiff could lose her case, and that counsel might not receive any compensation. Nonetheless, the Court finds that there is no need to adjust the lodestar. The lodestar amount calculated above adequately compensates Plaintiff's counsel for the risk they took in accepting, preparing, and trying Plaintiff's case.

### 5. Costs

Plaintiff seeks an award of $4,417.15 in costs for filing and service fees, deposition costs, computer research, subpoena fees, and parking fees [Doc. 78 at 21-23]. Defendants do not object to these costs [Doc. 86], and the Court finds them to be reasonable.

Accordingly, the request is approved. Plaintiffs will recover **$4,417.15** in costs.

## IV. Conclusion

In conclusion, for the reasons stated above, Plaintiff's Motion for an Award of Liquidated Damages [Doc. 74] and Plaintiff's Motion for Attorneys' Fees and Costs [Doc. 78] are both GRANTED IN PART and DENIED IN PART. Plaintiff's Motion for an Award of Liquidated Damages [Doc. 74] is GRANTED as to $200 liquidated damages for late overtime pay, and DENIED as to the remaining $4,242.48 of the total of $4,442.48 Plaintiff sought in liquidated damages. Plaintiff's Motion for Attorneys' Fees and Costs [Doc. 78] is GRANTED as to $4,417.15 in costs and as to $117,544.25 in attorneys' fees. Plaintiff's Motion for Attorneys' Fees and Costs [Doc. 78] is DENIED as to the remaining $41,929.92 in attorneys' fees of the total attorneys' fees of $159,474.17 Plaintiff sought.

All claims in this case having been finally ruled upon, the Clerk is DIRECTED to enter final judgment for Plaintiff Bianca R. Papapietro in the amount of:

- $349.24 in overtime pay;
- $200 in liquidated damages for late payment of overtime pay;
- $312 in damages for her three day suspension;
- $3,781.24 in retaliation damages;
- $117,544.25 in attorney's fees; and
- $4,417.15 in costs.

SO ORDERED, this 25 day of August, 2017.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE